**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **BICOM NY, LLC, et al.,** | : | **Case No. 17-11906 (MEW)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

----------------------------------------------------------------x

| | | |
|---|---|---|
| **CRAIG R. JALBERT, in his capacity as** | : | |
| **Liquidation Trustee,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | **Adv. Proc. No. 19-01315 (MEW)** |
| | : | |
| **GARY FLOM, VENIAMIN NILVA,** | : | |
| **ALEXANDER BOYKO and BNF PARTNERS** | : | |
| **NY LLC,** | : | |
| | : | |
| Defendants. | : | |

----------------------------------------------------------------x

## <u>DECISION AFTER TRIAL</u>

A P P E A R A N C E S :

DUNNEGAN & SCILEPPI LLC
New York, New York
*Attorneys for Craig R. Jalbert as Liquidation Trustee*
   By:  William Dunnegan, Esq.
        Laura Scileppi, Esq.
        Richard Weiss, Esq.

KESTENBAUM, DANNENBERG & KLEIN, LLP
New York, New York
*Attorneys for Defendant Alexander Boyko*
   By:  Jeffrey C. Dannenberg, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

      Plaintiff Craig R. Jalbert is the Liquidation Trustee (the "**Trustee**") of a Liquidation Trust

that was established under the confirmed plan of reorganization for three affiliated automobile

dealerships that were debtors before this Court.  The three debtors were:  (1) BICOM NY, LLC, which did business under the name Jaguar Land Rover Manhattan and is referred to herein as "**BICOM;**" (2) ISCOM NY, LLC, which did business under the name Maserati of Manhattan and is referred to herein as "**ISCOM;**" and (3) Bay Ridge Automotive Company, LLC, which did business under the name Bay Ridge Ford and which is referred to herein as "**BRAC.**"  In 2017, at the times of their bankruptcy filings, BICOM, ISCOM and BRAC were wholly owned by an entity known at BNF Partners NY LLC ("**BNF**").  The three owners of BNF were Alexander Boyko (**"Boyko"**), Veniamin Nilva ("**Nilva**") and Gary Flom ("**Flom**").

The Trustee filed this adversary proceeding in 2019, naming BNF, Flom, Boyko and Nilva as defendants.  The Trustee's Complaint asserted fraudulent transfer claims under section 548 of the Bankruptcy Code, fraudulent conveyance claims under certain provisions of the New York Debtor and Creditor Law, and other claims under other theories of liability.  The Trustee settled and dismissed the claims against Nilva in December 2020.  [Dkt. No. 81.]  A judgment by default was entered against BNF on January 20, 2021.  [Dkt. No. 83.]  A prior motion for the entry of a default judgment against Flom was deferred on August 24, 2020 based on Flom's agreement to file an answer and to appear for deposition.  [Dkt. No. 73.]  However, although Flom filed an answer and submitted to a deposition, neither Flom nor his counsel participated in required pretrial proceedings in 2021 or appeared at the scheduled trial on March 25, 2021.

In the Joint Pretrial Order the Trustee identified only the New York State law fraudulent conveyance claims as issues to be pursued at trial, and thereby dropped the other claims.  *See* Joint Pretrial Order §§ I, V.  [Dkt. No. 88].  The Trustee contends that BICOM, ISCOM and BRAC made transfers to Boyko and Flom at times when BICOM, ISCOM and BRAC were insolvent or had inadequate capital or believed that they were incurring debts that they would be unable to pay.

2

The Trustee also contends that the transfers were made without adequate consideration and that they are recoverable from Boyko pursuant to sections 544 and 550 of the Bankruptcy Code.

Boyko disclaimed knowledge as to the financial condition of BICOM, ISCOM and BRAC and offered no evidence on that issue. Boyko admitted that transfers were made to a joint account under which Boyko and Nilva had signatory authority, but he contended that he should not be treated as the "transferee" of those funds. Boyko also contended that he made loans to BICOM, ISCOM and BRAC and that any transfers to Boyko were just repayments of debts owed to Boyko.

Flom's failure to participate in required pretrial proceedings in 2021, and his (and his counsel's) failure to appear at trial constitutes a default. *See* Fed. R. Civ. P. 55, made applicable by Fed R. Bankr. P. 7055; *City of New York v. Mickalis Pawn Shop*, 645 F.3d 114, 129-131 (2d Cir. 2011). Such a default normally would mean that the well-pleaded factual allegations against the defaulting party are deemed to be true, except that an inquest would be needed as to damages. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). However, the Court also has discretion, once a default occurs, as to whether to enter a default judgment or whether to consider further evidence as to particular matters. *See* Fed. R. Civ. P. 55(b)(2); *Greathouse v. JHS Security Inc.*, 784 F.3d 105, 116 (2d Cir. 2015) (decision whether to enter default judgment is committed to the court's discretion); *Finkel v. Romanowicz*, 577 F.3d 79, 87 (2d. Cir. 2009) (Rule 55(b) permits the court to hear evidence rather than entering a default and the court's decision is a matter of discretion). Here, the Trustee's contentions about the Debtors' alleged financial condition are elements of the claims against Boyko as well as the claims against Flom. The court has discretion, in such a case, to consider the evidence as to the common issues in order to avoid inconsistent findings and judgments against similarly situated parties. *See Goguen v. Textron, Inc.*, No. 02-40245, 2006 U.S. Dist. LEXIS 11647, at *5 (D. Mass. 2006). Accordingly, in the

case of Flom the Court's proposed findings of fact as to factual issues that were also relevant to the claims against Boyko are based on the evidence at trial rather than simply being deemed to have been admitted as a result of Flom's default.

### Jurisdiction and Authority to Render a Final Decision

Boyko raised a personal jurisdiction defense in his answer but did not pursue that defense in the Joint Pretrial Order or at trial. Boyko and the Trustee agree that the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(H) and 1334 and they have knowingly and voluntarily consented to the entry of a final judgment by the Court. *See* 28 U.S.C. § 157(c)(2); *Wellness Int'l Network, Ltd. V. Sharif*, 135 S.Ct. 1932, 1948-49 (2015).

The record is murkier in the case of Flom. The Summons that was served upon Flom stated expressly that a failure to respond would be deemed to be a consent to the entry of judgment by the Bankruptcy Court. [Docket Nos. 18, 19] Flom thereafter defaulted. However, in the midst of default proceedings he elected to file an answer. [Docket No. 40]. Neither that answer, nor the amended answer that Flom's counsel later filed [Docket No. 71], stated expressly whether Flom consented to the entry of a final judgment by this Court, notwithstanding the fact that Rule 7012(b) required such an explicit statement. *See* Fed. R. Bankr. P. 7012(b). Flom also did not raise any defense based on personal jurisdiction, subject matter jurisdiction or this Court's constitutional authority to enter a final judgment. Instead, after his initial default Flom filed a letter confirming that he intended to participate fully in the litigation. [Docket No. 42]

Flom never expressly consented to the entry of a final judgment by this court. However, the Supreme Court has made clear that such "consent" may be implied and need not be express; otherwise, parties could engage in gamesmanship by participating in litigation but remaining silent on the court's constitutional authority until after they knew whether the outcome was favorable or

4

not. *See Wellness*, 135 S.Ct. at 1948. I find that Flom's unreserved statement of his intent to participate in this proceeding and his actual prior participation in this proceeding (until his apparent election not to proceed further in 2021), coupled with his and his counsel's failure to suggest any reservation of rights as to this Court's authority, constituted an implied but nevertheless knowing and voluntary consent to the entry of a final judgment by this Court.[1]

### Background Facts

Boyko is a citizen of the Russian Federation. He resides primarily in Moscow, Russia. During the early 2000s, Nilva was a distributor of a product that one of Boyko's companies manufactured in Russia. Boyko became acquainted with Nilva and became friends with him. In 2007, Nilva invited Boyko and Boyko's companion, Irina Gryaznova, to visit with Nilva in Florida. Boyko and Gryaznova liked the apartment complex in which Nilva lived, and so Boyko and Gryaznova bought an apartment in the same building in 2008. Boyko and Gryaznova spent between 1 and 3 winter months in Florida each year, and the rest of their times in Moscow.

Nilva suggested that Boyko open a bank account in Florida that could be used to pay expenses related to the condominium apartment and to cover other expenses that Boyko might incur when Boyko and Gryaznova were in the United States. Nilva said that Boyko would not be able to open an account solely in his own name because Boyko did not have a social security number, but that he could open a joint account with Nilva. Boyko was not certain that he needed Nilva's participation in order to open a bank account but he believed that a joint account would be convenient, as it would enable Nilva to make maintenance payments for the apartment while Boyko was absent. Boyko therefore agreed to open the joint account.

---

[1]     If Flom were to appeal and if the District Court were to reach a different conclusion on the "consent" issue, then as to Flom this Decision would constitute my proposed findings of fact and conclusions of law. *See* 28 U.S.C. § 157(c); *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 36 (2014).

Originally the joint bank account was to be used to allow Nilva to pay expenses that related to Boyko's apartment. Over time, however, the account was used to transfer monies for other business purposes as well. Boyko was aware that the account was being used for those business purposes and approved that use.

At one time (the date was not specified) Boyko learned that Nilva had transferred some funds out of the joint account to Nilva's personal account, and that Nilva had later returned the money. Boyko was not pleased with this discovery and he so informed Nilva. However, Boyko did not close the joint account, did not terminate Nilva's access to the account, and did not establish any other accounts to be used for his business purposes in the United States.

Nilva introduced Boyko to Flom at some time prior to 2009. Nilva informed Boyko that Nilva and Flom hoped to open an automobile dealership in Brooklyn, and Nilva persuaded Boyko to become a shareholder in that dealership. BRAC was then formed in 2009, with Flom, Nilva and Boyko as owners. Flom owned a 40% share, and Nilva and Boyko owned 30% each. Boyko and Nilva each contributed $1.2 million in exchange for their equity interests, while it was understood that Flom would receive his ownership interest in exchange for his contacts and for being the primary manager of the business.

Later, the parties decided to form new dealerships and also to change the ownership structure. BICOM was formed on September 18, 2014, and ISCOM was formed on October 28, 2015. Other dealerships were also formed at times that are not clear; those other dealerships did not file bankruptcy petitions. The parties also formed BNF to act as a holding company for the Debtors and the other dealerships, and BNF was the sole owner of BICOM, ISCOM and BRAC at the times of the transfers that are relevant to this case. Flom, Nilva and Boyko each owned one-third of the equity interests in BNF at the times of those transfers.

The Trustee and Boyko have stipulated (and the evidence at trial confirmed) that during the period February 3, 2015 through March 3, 2017, BICOM, ISCOM and BRAC made the following transfers of funds to the Boyko-Nilva joint account, in the total amount of $1,306,250:

| Transfers to Boyko | | | |
|---|---|---|---|
| Date | BICOM | ISCOM | BRAC |
| 2/3/2015 | $100,000 | | |
| 3/27/2015 | | | $25,000 |
| 3/31/2015 | $125,000 | | |
| 4/27/2015 | | | $25,000 |
| 5/5/2015 | $125,000 | | |
| 5/5/2015 | | | $25,000 |
| 5/29/2015 | | | $25,000 |
| 6/26/2015 | | | $56,250 |
| 6/26/2015 | | | $25,000 |
| 7/24/2015 | | | $25,000 |
| 9/24/2015 | | | $25,000 |
| 10/23/2015 | $75,000 | | |
| 12/2/2015 | $125,000 | | |
| 12/23/2015 | | | $25,000 |
| 1/6/2016 | $150,000 | | |
| 4/13/2016 | | $150,000 | |
| 5/6/2016 | $50,000 | | |
| 5/13/2016 | | $50,000 | |
| 6/14/2016 | | | $50,000 |
| 3/3/2017 | $25,000 | | |
| 3/3/2017 | $25,000 | | |
| **Subtotals** | **$800,000** | **$200,000** | **$306,250** |

Some of the transfers were made by check, while others were made by wire transfer.

The evidence offered by the Trustee confirmed that during the period March 30, 2015 through January 5, 2017 BICOM, ISCOM and BRAC made the following transfers to Flom on the following dates:

| Transfers to Flom | | | |
|---|---|---|---|
| Date | BICOM | ISCOM | BRAC |
| 3/30/15 | | | $2,290 |
| 3/31/15 | $125,000 | | |
| 3/31/15 | $125,000 | | |
| 4/1/15 | $125,000 | | |

7

| Transfers to Flom | | | |
|---|---|---|---|
| Date | BICOM | ISCOM | BRAC |
| 4/1/15 | $125,000 | | |
| 4/2/15 | $11,000 | | |
| 4/3/15 | | | $3,500 |
| 4/9/15 | $11,000 | | |
| 4/10/15 | | | $920 |
| 4/16/15 | $11,000 | | |
| 4/23/15 | $11,000 | | |
| 4/30/15 | $11,000 | | |
| 6/4/15 | $11,000 | | $3,500 |
| 6/11/15 | $11,000 | | $3,500 |
| 6/18/15 | $11,000 | | $3,500 |
| 6/25/15 | $11,000 | | $3,500 |
| 7/1/15 | $11,000 | | |
| 7/9/15 | $11,000 | | |
| 7/16/15 | $11,000 | | |
| 7/23/15 | $11,000 | | |
| 7/30/15 | $7,000 | | |
| 8/6/15 | $11,000 | | |
| 8/13/15 | $11,000 | | |
| 8/17/15 | $240,000 | | |
| 8/20/15 | $11,000 | | |
| 8/27/15 | $11,000 | | |
| 9/1/15 | $100,000 | | $3,500 |
| 9/1/15 | $75,000 | | |
| 9/3/15 | $11,000 | | |
| 9/10/15 | $11,000 | | |
| 9/17/15 | $11,000 | | |
| 9/24/15 | $11,000 | | |
| 9/30/15 | | | $3,500 |
| 10/1/15 | | | $3,500 |
| 10/8/15 | | | $3,500 |
| 10/13/15 | $675 | | |
| 10/15/15 | | | $3,500 |
| 10/22/15 | | | $3,500 |
| 10/29/15 | | | $3,500 |
| 11/05/15 | | | $3,500 |
| 11/12/15 | | | $3,500 |
| 11/19/15 | | | $3,500 |
| 11/23/15 | $250,000 | | |
| 11/25/15 | | | $3,500 |
| 12/1/15 | | | $5,918.35 |
| 12/3/15 | | | $3,500 |
| 12/10/15 | | | $3,500 |

| Transfers to Flom | | | |
|---|---|---|---|
| Date | BICOM | ISCOM | BRAC |
| 12/17/15 | | | $3,500 |
| 1/8/16 | | | $3,500 |
| 1/14/16 | | | $3,500 |
| 1/22/16 | | | $3,500 |
| 1/28/16 | | | $3,500 |
| 2/4/16 | | | $3,500 |
| 2/11/16 | | | $3,500 |
| 2/19/16 | | | $3,500 |
| 2/25/16 | | | $3,500 |
| 2/29/16 | | $8,000 | |
| 3/3/16 | | | $3,500 |
| 3/10/16 | | | $3,500 |
| 3/24/16 | | | $3,500 |
| 4/7/16 | | | $3,500 |
| 4/11/16 | $3,875 | | |
| 4/14/16 | | | $3,500 |
| 4/21/16 | | | $3,500 |
| 4/28/16 | | | $3,500 |
| 5/1/16 | $100,000 | | |
| 5/1/16 | $125,000 | | |
| 5/4/16 | | | $3,500 |
| 5/12/16 | | $4,000 | $3,500 |
| 5/16/16 | | | $1,028 |
| 5/19/16 | | $4,000 | $3,500 |
| 5/20/16 | | | $3,107.52 |
| 5/27/16 | | | $3,500 |
| 6/2/16 | | $4,000 | $3,500 |
| 6/9/16 | | $4,000 | $3,500 |
| 6/16/16 | | $4,000 | $3,500 |
| 6/23/16 | | $4,000 | $3,500 |
| 6/30/16 | | | $3,500 |
| 7/5/16 | | $25,000 | |
| 7/6/16 | | $4,000 | |
| 7/7/16 | | | $3,500 |
| 7/14/16 | | $4,000 | $3,500 |
| 7/21/16 | | $4,000 | $3,500 |
| 7/28/16 | | $4,000 | $3,500 |
| 8/4/16 | | $4,000 | $3,500 |
| 8/11/16 | | $4,000 | $3,500 |
| 8/18/16 | | $4,000 | $3,500 |
| 8/25/16 | | | $3,500 |
| 9/1/16 | | $4,000 | $3,500 |
| 9/7/16 | | $4,000 | |

| Transfers to Flom | | | |
|---|---|---|---|
| **Date** | **BICOM** | **ISCOM** | **BRAC** |
| 9/8/16 | | $4,000 | $3,500 |
| 9/15/16 | | $4,000 | $3,500 |
| 9/22/16 | | $4,000 | $3,500 |
| 9/29/16 | | $4,000 | $3,500 |
| 10/6/16 | | $4,000 | $3,500 |
| 10/14/16 | | | $3,500 |
| 10/20/16 | | $4,000 | $3,500 |
| 10/27/16 | | $4,000 | $3,500 |
| 11/2/16 | | | $3,500 |
| 11/3/16 | | $4,000 | |
| 11/10/16 | | $4,000 | $3,500 |
| 11/17/16 | | $4,000 | $3,500 |
| 11/23/16 | | $4,000 | $3,500 |
| 12/1/16 | | | $3,500 |
| 12/8/16 | | | $3,500 |
| 12/15/16 | | | $3,500 |
| 12/22/16 | | | $3,500 |
| 12/29/16 | | | $3,500 |
| 1/5/17 | | | $3,500 |
| **Subtotals** | **$1,768,550** | **$141,000** | **$258,263.87** |

The overall total of all of the challenged transfers to Flom is $2,167,813.87.

### Discussion

**1.      The Trustee's Standing to Pursue Claims Under New York Law**

Section 544(b)(1) of the Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property" so long as the transfer is voidable under applicable law "by a creditor holding an unsecured claim that is allowable under [11 U.S.C. § 502] or that is not allowable only under [11 U.S.C. § 502(e)]."  The Trustee's right to pursue claims under section 544 therefore depends, in the case of each separate Debtor, on the existence at least one actual unsecured creditor who holds an allowable claim and who would have had the right to pursue avoidance claims under state law.  *In re Musicland Holding Corp.*, 398 B.R. 761, 777 (Bankr. S.D.N.Y. 2008) (noting that there must be a creditor who could have avoided a transfer under state

law and who also holds an allowable claim in the bankruptcy case in order for a trustee to have standing to pursue a state law fraudulent transfer claim under section 544(b)).

A single creditor who may pursue a particular claim is sufficient to "trigger" the Trustee's standing to pursue the claim under section 544. *MC Asset Recovery, LLC v. Southern Co.*, No. 06-cv-0417, 2006 U.S. Dist. LEXIS 97034, at *17-18 (N.D. Ga. Dec. 11, 2006). Once a trustee establishes the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer "not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate." *Silverman v. Sound Around, Inc. (In re Allou Distribs.)*, 392 B.R. 24, 32 (Bankr. E.D.N.Y.2008). The size of the triggering creditor's claim is irrelevant, as a single triggering creditor provides a trustee with standing to set aside an entire transfer. *Geron v. Craig (In re Direct Access Partners, LLC*, 602 B.R. 495, 513 (Bankr. S.D.N.Y. 2019). If the Trustee establishes a claim under section 544, then section 550 of the Bankruptcy Code allows the Trustee to recover the transfer or its value from the transferee. *See* 11 U.S.C. § 550.

BICOM, ISCOM and BRAC were New York entities with their primary places of business in New York. Boyko and the Trustee agree (and the circumstances of the transfers confirm) that New York law governs any state law fraudulent transfer claims the Trustee seeks to assert under section 544. New York adopted the Uniform Voidable Transactions Act in 2019, but the new provisions are not retroactive and apply only to transfers that have occurred on or after April 4, 2020. All of the transfers at issue in this case occurred prior to that date. Any state law claims that the Trustee wishes to pursue therefore are "fraudulent conveyance" claims that are governed by the terms of the New York Debtor and Creditor Law as they existed prior to the effective date of the Uniform Voidable Transactions Act.

In this case, the Trustee has asserted claims under three separate provisions of the former New York Debtor and Creditor Law.  These three provisions differ in describing the creditors who may assert claims, and therefore they differ in the proof that the Trustee must offer in order to show his entitlement to pursue such claims.

### A.    Claims Based on Alleged Insolvency – Section 273

Section 273 of the New York Debtor and Creditor Law provides that every conveyance made and every obligation incurred by a person "who is or will be thereby rendered insolvent" is fraudulent as to "creditors," without regard to intent, if the conveyance is made or the obligation is incurred without a "fair consideration."  NY DCL § 273.  Section 273 refers to "creditors" generally, but unlike some other provisions of the Debtor and Creditor Law section 273 does not specifically permit "future" creditors to assert claims.  New York courts have held that claims under section 273 may only be asserted by persons who were creditors at the time of the challenged transfers.  *See United Nat. Funding, LLC v. Volkmann,* 25 Misc. 3d 1233(A), 906 N.Y.S.2d 776, at *13 (Sup. Ct. N.Y. Cty. 2009) (permitting plaintiff's section 273 claim to survive a motion to dismiss because allegations suggested that the plaintiff may have been a creditor when the transfers at issue were made); *see also Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 35 (S.D.N.Y. 2002) (contrasting section 273 on the one hand and sections 275 and 276 on the other and noting that the absence of the phrase "future creditors" in section 273 means that there must be a "present creditor" at the time of the transfer (citing *In re 9281 Shore Road*, 187 B.R. 837, 851 (E.D.N.Y. 1995)).  The Trustee therefore may only pursue claims under section 273 on behalf of each Debtor if he identifies (in the case of each Debtor) one or more persons who held creditor claims at the time of the challenged transfers and who continued to be creditors at the time such Debtor filed its chapter 11 bankruptcy petition.

12

The evidence at trial showed that from 2014 through the date of the bankruptcy filings BICOM was indebted to the City of New York Department of Finance based on a variety of tax payment and tax filing deficiencies. BICOM also was indebted to Sid Paterson Advertising, Inc. based on a small claims court judgment entered February 1, 2015, which BICOM never paid. In addition, BICOM was indebted to Peter Pierce for amounts accruing May 22, 2015 that remained unpaid at the time of the bankruptcy filing. The Trustee established that those claims existed at the times of the relevant transfers and that they are allowable claims in BICOM's bankruptcy case. The Trustee therefore has standing to pursue claims under section 273 on behalf of BICOM and against Boyko and Flom.

The evidence at trial showed that ISCOM was indebted to the Internal Revenue Service based on ISCOM's failure to file a 2015 tax return. This debt preceded the relevant transfers by ISCOM to Boyko, it represented an allowable claim in ISCOM's case, and it is sufficient to give the Trustee standing to pursue claims against Boyko under section 273 in the case of ISCOM. The same indebtedness preceded all but $8,000 of the challenged transfers that ISCOM made to Flom. The evidence at trial also showed that ISCOM was continually indebted to Motorsports Consultants LLC from and after February 14, 2016 and that Motorsports held an allowable claim at the time of the ISCOM bankruptcy filing. The initial debt to Motorsports occurred prior to all of the challenged transfers to Boyko and to Flom. The Trustee therefore has standing to pursue claims under section 273 on behalf of ISCOM and against Flom and Boyko.

The evidence showed that BRAC was continually indebted to Alpha Fire and Security from and after July 31, 2014, and that Alpha Fire and Security held an allowable claim at the time of BRAC's bankruptcy filing. The indebtedness to Alpha Fire and Security predated all of the

challenged transfers by BRAC to Boyko and Flom.  The Trustee therefore has standing to pursue claims under section 273 on behalf of BRAC and against Boyko and Flom.

## B. Claims Based on Unreasonably Small Capital – Section 274

Section 274 of the NY DCL provides that every conveyance made without fair consideration, at a time when the person making it "is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NY DCL § 274.  The Trustee may pursue claims under section 274 if he identifies an unpaid creditor or creditors at the time of a Debtor's bankruptcy filing so long as that person either was a creditor at the time of the challenged transfer or became a creditor "during the continuance of" a business for which unreasonably small capital existed.  *See Official Comm. of Asbestos Claimants of G-I Holding, Inc.*, 277 B.R. at 36 (holding that creditors who did not have claims at the time of a transfer but who became creditors while the debtor continued to have unreasonably small capital were entitled to make claims under section 274); *Laco X-Ray Sys., Inc. v. Fingerhut*, 88 A.D.2d 425, 432, 453 N.Y.S.2d 757, 762 (1982) (noting that section 274 requires only that there was a creditor at some point in time at which the debtor had too little capital).

As explained above, the evidence showed that there were creditors of BICOM, ISCOM and BRAC at the times of the relevant transfers who continued to be creditors at the time of the bankruptcy filings.  Accordingly, there were creditors at the time of the challenged transfers and/or during the continuance of a business for which unreasonably small capital allegedly existed, and the Trustee has standing to pursue claims under section 274.

C.    **Claims Alleging an Intent or Belief that Debts Would Not Be Paid as They Matured – Section 275**

The Trustee also asserts claims under section 275 of the New York Debtor and Creditor Law, which states that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature is fraudulent as to both present and future creditors."  NY DCL § 275.  Since "future" creditors may make claims under section 275, the Trustee may pursue such claims so long as BICOM, ISCOM and BRAC each had a single unpaid unsecured creditor at the time of its bankruptcy filing.  The evidence showed that this was the case and that the Trustee therefore has standing to pursue claims under section 275.

2.    **Whether the Trustee's Claims are Premature**

Boyko has contended that it is improper for the Trustee to combine an action under section 544 of the Bankruptcy Code (which seeks to avoid certain transfers) with an action to "recover" the transfers under section 550.  I note that parties who are sued as "subsequent transferees" sometimes argue that they cannot be pursued under section 550 unless a trustee first obtains a judgment against an initial transferee holding that the underlying transfer was avoidable.  Even in this context the majority of courts (particularly in this district) disagree, and have held that a claim may be pursued directly against a subsequent transferee without the requirement of a separate prior action against the initial transferee.  *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 30-31 (S.D.N.Y. 2013).  In this case, the Trustee does not seek recovery from a subsequent transferee, but instead contends that Boyko was the initial transferee.  There is nothing in the Bankruptcy Code, or in common sense, that requires the Trustee to pursue Boyko in two separate litigations (one seeking avoidance under section 544, and the other seeking recovery under section 550).  The usual practice is that rights

15

under sections 544 and 550 are asserted in the same action, and courts have regularly approved

of this practice. *See* 5 COLLIER ON BANKRUPTCY ¶ 550.07 (16th ed. 2021) (noting that a trustee

"usually will file a consolidated action to avoid the transfer and recover the property transferred

or its value.")  Boyko's contention that some portion of the Trustee's action is premature is

therefore without merit.

**3.    Whether Flom and Boyko Were Transferees**

There was no suggestion at trial that Flom was anything but the intended transferee of the

relevant transfers, and no suggestion that he or his accounts were used as "mere conduits" to

facilitate transfers that were actually being made to other persons or entities.  Boyko, on the other

hand, denied that the various transfers were made "to" Boyko or for his benefit.

I note in this regard that Boyko's primary defense was that the transfers that were made

constituted repayments of debts that were owed to Boyko, and there is an inherent inconsistency

between this assertion and Boyko's separate argument that he was not even a "transferee" of the

relevant payments.  If (in fact) the transfers constituted repayments of prior loans, then plainly

they would have been made to Boyko and for his benefit.  The inconsistency does not matter,

however, because the evidence made clear that Boyko was a transferee of the transfers at issue.

Boyko's arguments as to his status as a transferee are an effort to fit himself into a narrow

fact pattern that was the subject of a prior ruling that this Court made regarding transfers through

a joint account that Nilva held with Boyko's companion, Irina Gryaznova.  I held that Ms.

Gryaznova was not a "transferee" of funds that Nilva caused to be transferred through that joint

account without Ms. Gryaznova's knowledge or approval, and that ruling has recently been

affirmed on appeal.  *See Jalbert v. Gryaznova (In re BICOM NY, LLC)*, 619 B.R. 795 (Bankr.

S.D.N.Y. 2020), *aff'd*, No. 20 cv 8022 (JSR), 2021 WL 3174143 (S.D.N.Y. July 26, 2021).

16

Boyko seeks a similar ruling, but the facts of his case are vastly different from the admitted facts in Gryaznova's case.

Gryaznova was not an owner, officer or director of any of the Debtors. She opened a relatively small joint account with Nilva with a deposit of $15,000 in order to cover expenses of a visa application. It was admitted that the account was not supposed to be used for other purposes. In 2016, however, Nilva used the Gryaznova joint account as a way of hiding the source of a transfer that he wished to make. More particularly, Nilva sought to transfer $1 million from BICOM's account at Wells Fargo to another dealership (Kings Automotive). A direct transfer from BICOM to King Automotive would have violated provisions of BICOM's agreements with Chase. A direct transfer also would have revealed that BICOM had secretly opened the separate bank account at Wells Fargo, which was another violation of BICOM's agreements with Chase. In order to make the transfer while concealing the source of the funds – and admittedly without the knowledge of Gryaznova – Nilva wrote a check payable to Gryaznova from BICOM's Wells Fargo account, endorsed it himself and deposited it in the joint account. Simultaneously, Nilva wrote a check in favor of Kings Automotive and payable from the joint account, and immediately deposited that check in the Kings Automotive account. Gryaznova knew nothing about this until long afterwards. It was admitted that she was not an intended beneficiary of Nilva's actions and that she had not actually benefited from them.

In a separate adversary proceeding, the Trustee contended that Gryaznova (as a joint owner of the account into which Nilva had deposited funds) was a "transferee" and was liable to repay the $1 million that BICOM had transferred. This Court held otherwise, based on the uncontested facts in that case. 619 B.R. at 799. The Court noted that a "recipient" of funds is not necessarily a "transferee," citing the decision in *In re Finley, Kumble, Wagner, Heine,*

17

*Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 56-57 (2d Cir. 1977), and noted that

Gryaznova had less actual control over the relevant funds than the alleged transferee had had in

the *Finley Kumble* case.  619 B.R. at 799.  The Court further held that Gryaznova had not had

any actual opportunity to use the relevant funds; that the Trustee's arguments about Gryaznova's

theoretical legal rights as a joint account holder "pushed legal fictions to extremes that make no

sense and that are inconsistent with the teachings of the *Finley Kumble* decision;" and that Ms.

Gryaznova's bank account was just "a brief waystation for the funds, not a destination."  619

B.R. at 799, 801.  Judge Rakoff affirmed the Court's rulings on appeal for substantially similar

reasons.

     The facts as to the transfers that Boyko received were radically different.  It was admitted

that Gryaznova's account was supposed to be used only to hold the funds that Gryaznova herself

had provided.  By contrast, Boyko admitted that his own joint account with Nilva was used for

business purposes, and he acknowledged that the account was used to receive transfers from the

Debtors that were intended for Boyko.

     In addition, the admitted intended transferee of the $1 million that was transferred

through Gryaznova's account was Kings Automotive, not Gryaznova herself.  619 B.R. at 797.

Gryaznova's account was used solely for the purpose of concealing Nilva's tracks.  *Id.*  In the

case of Boyko, however, the evidence at trial showed that Boyko himself was the intended

transferee of the transfers that are at issue.  Nilva and Flom both so testified.

     Furthermore, the $1 million deposit in the Gryaznova account was subject to an

immediate and offsetting claim (the check that Nilva had written in favor of Kings Automotive),

and the funds actually disappeared from the Gryaznova joint account within two days, when the

Kings Automotive check formally cleared.  *Id.*. at 799.  Gryaznova never knew about the funds

and had no real-world opportunity to use them.  *Id*.  Boyko tried to suggest that similar things might have happened in his case.  He testified generally that Nilva told him, after the fact, that there were occasions when money was moved out of the joint account and sent to other companies and that sometimes this was done almost immediately.  However, Boyko offered no specifics as to any particular transfer of funds out of the joint account or as to Nilva's alleged use of the funds involved in any particular transfer.  Although Nilva admitted his wrongful and deceptive use of the Gryaznova account during his deposition testimony, Nilva denied that any similar thing had been done using Boyko's joint account.  Instead, Nilva testified that no transfers had been made from the Boyko joint account without Boyko's knowledge and approval.

Boyko's primary argument is that Nilva had access to the joint account and that when the account ultimately was closed Boyko discovered that Nilva had allegedly removed more than $3 million from it.  Again, however, Boyko made no effort to retrieve relevant bank records and offered no actual evidence that Nilva had taken funds, or as to when Nilva had done so.  Boyko also admitted that at least some of the monies that were transferred to the joint account were used to pay Boyko's expenses or otherwise redounded to Boyko's benefit.  Even if Nilva ultimately removed some monies from the account (which Boyko never showed), that merely would make Boyko the victim of a theft that post-dated the transfers that were made to him.  The possibility that Nilva at some time may have engaged in such theft, involving an unspecified amount of funds and with no specifics as to the timing or as to any of the accompanying circumstances, does not negate Boyko's status as the initial transferee of the funds that were transferred by BICOM, ISCOM and BRAC.

I conclude based on the evidence at trial that Boyko was an actual and intended transferee in the case of the challenged transfers, and was not a mere "conduit" as Gryaznova was.

19

4.      **Whether Transfers Were Made In Return for Fair Consideration**

A transfer violates sections 273 through 275 of the NYDCL if, among other things, the

transfer is made without "fair consideration." "Fair consideration" exists under the following

circumstances:

> a.    When in exchange for such property, or obligation, as a fair equivalent
> therefor, and in good faith, property is conveyed or an antecedent debt is
> satisfied, or

> b.    When such property, or obligation is received in good faith to secure
> a present advance or antecedent debt in amount not disproportionately small as
> compared with the value of the property, or obligation obtained.

NYDCL § 272.

Proving a lack of "fair consideration" ordinarily is an element of the Trustee's case under

sections 273 through 275 of the NYDCL, as to which the Trustee bears the burden of proof by a

preponderance of the evidence.  *See Gowan v. Patriot Group, LLC (In re Dreier)*, 452 B.R. 391,

442-43 (Bankr. S.D.N.Y. 2011); *Deflora Lake Dev. Assocs., Inc. v. Hyde Park*, No. 13-CV-4811,

2016 WL 7839191, at *3 (S.D.N.Y. June 9, 2016) (the party challenging a conveyance under

section 273 has to show a lack of fair consideration) (quoting *Joslin v. Lopez*, 309 A.D.2d 837,

838, 765 N.Y.S.2d 895, 897 (2d Dep't 2003)); *Atateks Foreign Trade Ltd. v. Dente*, 11-cv-01892

(ALC), 2017 WL 4221085, at *5 (S.D.N.Y. Sept. 22, 2017) (elements of NY DCL Section 273

and 274 must be proved by the plaintiff); *Silverman v. Actrade Capital, Inc. (In re Actrade Capital,*

*Inc.*), 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005) (under New York law, the party seeking to have

the transfer set aside bears the burden of proof on the element of fair consideration and, since it is

essential to a finding of fair consideration, good faith) (citing *United States v. McCombs*, 30 F.3d

310, 326 (2d Cir. 1994)).  However, the concept of "fair consideration" under the New York Debtor

and Creditor Law includes not only a "value" element but also a "good faith" requirement.  *See In*

*re Vivaro Corp.*, 524 B.R. 536, 550 (Bankr. S.D.N.Y. 2015) (citing *Estate of Rufffini v. Norton*

20

*Law Grp., PLLC (In re Ruffini)*, Adv. Proc. No. 12-8396, 2014 WL 714732, at *7 (Bankr. E.D.N.Y. Feb. 25, 2014).  Many federal and state court decisions have held that a transfer made to a director, officer or shareholder when an entity is insolvent is not made in "good faith" even if it is made in repayment of a valid debt, because it does not constitute "good faith" for an insider to receive a preference over other creditors.  *See, e.g., Allen Morris Comm. Real Estate Servs. Co. v. Numismatic Collectors Guild, Inc.*, No. 90 Civ. 264, 1993 U.S. Dist. LEXIS 7052, at *29 (S.D.N.Y. May 27, 1993); *Hirsch v. Gersten (In re Centennial Textiles)*, 220 B.R. 165, 172 (Bankr. S.D.N.Y. 1998); *JDI Display Am., Inc. v. Jaco Electronics,* 188 A.D.3d 844, 845, 136 N.Y.S.3d 349 (2d Dep't 2020); *Matter of CIT Group/Commercial Servs., Inc. v. 160-09 Jamaica Ave. Ltd. P'ship*, 25 A.D.3d 301, 303, 808 N.Y.S.2d 187 (1st Dept.  2006) (holding that "[t]ransfers to a controlling shareholder, officer or director of an insolvent corporation are deemed to be lacking in good faith and are presumptively fraudulent").  Some other decisions describe this principle as a "presumption" rather than as a *per se* rule.  *See, e.g., Trinity Centre LLC v. Morrison Mahoney LLP*, No. 655335/2018, 2020 N.Y. Misc. LEXIS 2251 *16-17 (Sup. Ct. N.Y. Co. Apr. 3, 2020).

### A.    Transfers to Boyko

Boyko argued at trial that he made a number of loans to the dealerships and that funds that were transferred to him constituted repayments of the prior loans.  He therefore argued that "fair consideration" was provided for the transfers in the form of the satisfaction of antecedent debts owed to Boyko.  For the most part the evidence showed otherwise.

The evidence at trial showed that Boyko made an initial capital investment in BRAC in the amount of $1.2 million.  Boyko occasionally referred to that amount as a loan, but the other evidence (including his own testimony) made clear that the $1.2 million constituted an equity investment, not a loan.

Boyko testified that he made other loans to BRAC to facilitate the construction of BRAC's premises. However, Boyko offered no supporting evidence as to the existence of these loans. He stated that he believed that there was a loan agreement but that Nilva had possession of it and did not turn it over to Boyko after the dealerships failed. Boyko similarly did not know what repayments he had received from BRAC and what the balances of the loans were at any given points in time. Boyko also did not retrieve any bank records that might have shown the movement of funds by Boyko to BRAC, and offered no evidence as to these alleged loans other than his own incomplete recollection. By contrast, the Trustee offered evidence that the Trustee had found no record of any such loans in BRAC's books and records, and that none of the transfers to Boyko were recorded in the general ledgers of BICOM, ISCOM and BRAC as repayments of loans.

Boyko testified that he also made a loan in connection with the formation of BICOM. However, the BICOM operating agreement showed a $12 million capital contribution by BNF. When confronted with the operating agreement, Boyko acknowledged that his loan "probably" had been made to BNF and not directly to BICOM. No evidence of a loan made directly to BICOM was offered.

The testimony at trial also included deposition testimony by Nilva and Flom. They testified very generally that Boyko invested sums as both capital contributions and loans and that transfers to Boyko were made as returns of his "investments." However, they could not identify specifically which entities had been recipients of such investments from Boyko. They also testified that they did not distinguish among the group of commonly owned companies, which consisted of the three Debtors, the Debtors' holding company (BNF) and other non-debtor affiliated companies that operated other dealerships. Instead, they Flom and Nilva caused repayments of portions of Boyko's total investments in all of the companies to be made to Boyko

22

from whichever company tended to have cash available for that purpose at any given time, regardless of whether the "investment" was in the form of a loan or equity investment, and regardless of whether the company making the payment had actually received a loan from Boyko or actually owed funds to Boyko.

Boyko testified that he made loans to various dealerships and/or to BNF in the total amount of $47 million, but the group of dealerships included entities other than BICOM, ISCOM and BRAC, and Boyko could not identify the specific entities to which loans allegedly were made. When pressed, Boyko acknowledged that he could not state that he actually dealt with the dealerships themselves and that he may have dealt with BNF as the holding company. Once again, the Trustee testified that he had found no record of loans to BICOM and ISCOM in those entities' books and records and that the general ledgers did not identify any of the relevant transfers as repayments of loans. Except as discussed below, Boyko did not produce contrary documents. He also did not offer in evidence (or produce in discovery) bank records that might have shown transfers by him directly to the Debtors on particular dates, or that might have identified the actual recipients of the "loans" or other investments that he allegedly made. Where evidentiary facts as to the nature and value of consideration are within a transferee's control, the burden of coming forward with evidence should be cast upon the transferee. *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 671 (Bankr. E.D.N.Y. 2008); *Gelbard v. Esses*, 96 A.D.2d 573, 576, 465 N.Y.S.2d 264 (2d Dep't 1983); cf. *Republic Ins. Co. v. Levy*, 69 Misc. 2d 450, 453, 329 N.Y.S.2d 918, 920 (Sup. Ct. Rockland Cty. 1972). Boyko did not come forward with such evidence.

The only documentary evidence of any loans made by Boyko consisted of two documents that apparently were prepared in or after September 2016. First, Boyko offered into evidence an agreement that was dated September 29, 2016 and that asserted generally that Boyko had made

23

"capital contributions and loans" to BRAC, BICOM and two other entities (Kings Automotive Holdings, LLC and White Plains Auto Company) in the amounts of $22,142,500 (capital contributions) and $21,387,636.86 (loans, including interest). Notably, this document actually contradicts Boyko's testimony as to whether he made capital contributions apart from his initial equity contribution in BRAC. In addition, no breakdowns were provided as to any loans that had been provided. In the agreement, BNF agreed to assume the repayment of all of the capital contributions and loans, but without the release of any of the original borrowers. There is nothing in this exhibit, however, that permits the Court to identify any particular loans that might have been made to BRAC or to BICOM (as opposed to being made to other entities), and ISCOM is not even mentioned in the exhibit.

Boyko also offered into evidence another agreement that stated that Boyko had made a loan to BICOM in February 2016 in the amount of $1.1 million and that on or about September 16, 2016 Boyko had also repaid an obligation that BICOM, ISCOM and BRAC jointly owed to Chase in the amount of $16,042,646. BICOM, ISCOM and BRAC agreed in September 2016 to repay the aggregate of those amounts within one year, but the bankruptcy filings occurred before that one-year anniversary was reached. This exhibit supports a finding that the three debtors became jointly and severally obligated to Boyko in the amount of $17,142,646 as of September 2016. However, before that date the only evidence of an outstanding loan is a loan to BICOM in the amount of $1.1 million in February 2016, for which there is no evidence that the other Debtors had any liability until September 2016.

Boyko filed proofs of claim against each Debtor that purported to reflect his claims to recover the amounts he had provided as loans. The BICOM and BRAC proofs of claim (PTX 107 and PTX 109) each sought repayment of $21,387,645.86, but in support of those claims Boyko

attached only the two September 2016 agreements that were admitted into evidence at trial. As noted above, the September 29, 2016 "Assumption Agreement" merely stated that Boyko had made total loans to BICOM, BRAC, Kings Automotive and White Plains Auto Company, Inc. in the amount of $21,387,646.86. No evidence was offered showing that any part of these sums were loaned to BICOM or to BRAC. In the case of ISCOM (PTX 108), Boyko only sought repayment of $16,042,646, which reflects the "joint" liability that ISCOM, BICOM and BRAC incurred when Boyko repaid a portion of the Chase floor plan debt in September 2016. The proof of claim thereby confirmed that no other debts were owed to him by ISCOM.

I find based on the evidence at trial that Boyko made a loan of $1.1 million to BICOM in February 2016; that the three Debtors became jointly and severally obligated to Boyko in the amount of $17,142,646 in September 2016 as the result of Boyko's repayment of a portion of the Debtors' obligation to Chase; and that Boyko made no other loans to BICOM, ISCOM and BRAC.

Virtually all of the transfers made to Boyko by BICOM were made before February 2016. Even if Boyko has a "loan repayment" defense to transfers by BICOM after February 2016, that would only result in a defense to the three transfers that BICOM made in or after February 2016, which totaled $100,000. In addition, all of the transfers to Boyko by BRAC and ISCOM occurred before September 2016. Even if Boyko has a "loan repayment" defense to transfers by BRAC and ISCOM after September 2016, that defense would be irrelevant because no transfers were made after that date. I therefore find, based on the evidence at trial, that all of the transfers to Boyko by BRAC and ISCOM, and all of the transfers made by BICOM prior to February 2016, were without consideration. Only the final $100,000 of payments made by BICOM constituted repayments of an antecedent debt.

25

As noted above, a defendant may be barred from contending that there was "fair consideration" for a loan repayment if the defendant is an officer, director or shareholder and if the payment was made at a time when the company was insolvent. Boyko's contention that he was not an "insider" of BICOM, and the evidence at trial as to BICOM's solvency at the times of the transfers, are discussed below in parts 5 and 6(A) of this Decision.

**B.      Transfers to Flom**

The regularity of some of the transfers to Flom, and the amounts thereof (in particular the many $11,000 payments by BICOM, the many $4,000 payments by ISCOM, and the many $3,500 payments by BRAC) suggest the possibility that some of the relevant transfers may have constituted wage or salary payments in exchange for services that Flom provided. However, Flom did not appear at trial, and no evidence was offered to suggest that any consideration actually was provided for any of the transfers that were made to Flom. There was no evidence of any salary agreements, no evidence of wage payments, no evidence that Flom had ever made loans that were being repaid, and no evidence of any other consideration. Flom also has defaulted and is deemed to have admitted the Trustee's allegations that there was no consideration for the transfers. I therefore find that the transfers to Flom were without consideration.

**5.      Whether Boyko Was An "Insider"**

At trial, Boyko's counsel argued that Boyko played no role in the day-to-day management of BICOM, ISCOM and BRAC, and elicited testimony to that same effect from Boyko. Boyko's counsel also argued that as a result Boyko should not be regarded as an "insider" of the three Debtors and should not be subject to the presumption (under New York

law) that a loan repayment to a director, officer or shareholder, made while an entity is insolvent, is without good faith.  I disagree.

As noted above, the Trustee has only asserted claims under New York State law and has not pursued claims under section 548 of the Bankruptcy Code.  Accordingly, the definition of "insider" that appears in section 101(31) of the Bankruptcy Code is not the governing standard.  Instead, Boyko's status as an "insider" is relevant only insofar as that status has implications for the claims that have been asserted under New York State law.  The New York decisions (discussed above) have made clear that loan repayments to corporate officers, directors or shareholders are not in "good faith" if they are made when an entity is insolvent.  Actual day-to-day operational control is not required; a transferee's status as a shareholder is sufficient.

Boyko was a direct shareholder in BRAC until BNF was formed.  Thereafter, Boyko was a one-third owner of BNF.  BNF was merely a holding company, and Boyko's one-third ownership of BNF gave him indirect one-third shareholder control of BICOM, ISCOM and BRAC.  I find that he was an insider for purposes of application of the New York rules regarding loan repayments to corporate insiders.  The existence of BNF as an intermediate holding company did not alter the three shareholders' effective control of the three Debtors, and does not free Boyko from application of the New York rule.  Accordingly, Boyko's ability to assert loan repayments as a defense (in the case of $100,000 of the BICOM transfers) depends on whether the evidence shows that BICOM was "insolvent" at the time of those transfers.

6.    **Findings as to The Financial Condition of BICOM, ISCOM and BRAC**

    A.    **Solvency at the Times of the Relevant Transfers**

New York law provides that "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing

debts as they become absolute and matured." NY DCL § 271(1); *In re Operations NY LLC*, 490 B.R. at 97. For this purpose, "assets" include all property that is not exempt from liability for the payment of debts, and "debts" include "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." NY DCL § 270.

Insolvency is a question of fact that must be determined under the circumstances of each particular case. *E.g.*, *Deflora Lake Dev. Assocs., Inc. v. Hyde Park*, 2016 WL 7839191, at *3. Insolvency must be measured as of the date(s) on which the challenged transfers occurred, and "cannot be presumed from subsequent insolvency at a later point in time." *O'Toole v. Karnani (In re Trinsum Grp.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011).

The solvency of a business is usually calculated based on the revenues that the business may generate as a going concern, and not based on the present liquidation value of its assets. *See Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007); *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir. 2000). Solvency should be measured on a going concern basis unless the demise of the business is so clearly imminent that the business is incapable of generating any ongoing revenues. *See, e.g.*, *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir. 1998); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3rd Cir. 1992) (proper to use sale values that presumed a going concern unless bankruptcy was "clearly imminent"); *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990) (going concern valuation should be used unless the "business is on its deathbed"); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 131 (Bankr. D. Mass. 1989) (holding that solvency is to be measured by the going concern value of a business and "not the liquidation value of its assets less its liabilities"); *Fryman v. Century Factors,*

*Factor for New Wave (In re Art Shirt Ltd.)*, 93 B.R. 333, 341 (E.D. Pa. 1988) (going concern values should be used unless a company is "on its deathbed").

A plaintiff ordinarily bears the burden to prove "insolvency" for purposes of proving a claim under section 273 of the NYDCL. *See Direct Access Partners*, 602 B.R. at 548; *Deflora Lake Dev. Assocs., Inc. v. Hyde Park*, 2016 WL 7839191, at *3 (the party challenging a conveyance under section 273 has to show insolvency), (quoting *Joslin v. Lopez*, 309 A.D. at 838; *Atateks Foreign Trade Ltd. v. Dente*, 2017 WL 4221085, at *5 (elements of NY DCL Section 273 and 274 must be proved by the plaintiff). However, if a plaintiff shows that a transfer has been made without fair consideration there is a rebuttable presumption of insolvency that shifts the burden to the defendant to show solvency at the time of the transaction and immediately thereafter. *Geo-Grp. Commc'ns, Inc. v. Chopra*, No. 15 CIV. 1756 (KPF), 2016 WL 390089, at *7 (S.D.N.Y. Feb. 1, 2016) (considering the issue at the pleading stage); *In re Vivaro Corp.*, 524 B.R. at 551, 553; *Battlefield Freedom Wash, LLC v. Song Yan Zhuo*, 148 A.D.3d 969, 971 (2d Dep't 2017); *Wimbledon Fin. Master Fund, Ltd. v. Bergstein*, No. 150584/2016, 2017 N.Y. Misc. LEXIS 2713 *8 (Sup. Ct. N.Y. Co. July 17, 2017).

One caveat must be noted. As described above, New York courts have held that if a transfer is made to an insider at a time when a business is insolvent then there is a presumption that the transfer is not in good faith and "fair consideration" is lacking. That presumption requires proof of insolvency. As noted in the prior paragraph, New York courts also have held that if a plaintiff proves that a transfer has been made without fair consideration then there is a presumption that the transferor was insolvent. A plaintiff must prove either insolvency or a lack of consideration in order to invoke one of these presumptions; the two presumptions cannot be invoked at the same time so as to free the plaintiff of its burden of proving either element of its claims.

29

The evidence at trial as to the solvency or insolvency of BICOM, ISCOM and BRAC was incomplete, to say the least.

The Trustee offered into evidence copies of the monthly financial statements that BICOM, ISCOM and BRAC submitted to the automobile companies for which they acted as dealers. The Trustee did not vouch for the accuracy of these statements, and in fact suggested they were unreliable. The purpose of offering them was to show that even if they were presumed to be correct, certain required adjustments allegedly showed that the entities were insolvent. The Trustee offered a separate exhibit (PTX 30) that corrected the net equity calculations in the monthly statements in two ways; (1) by correcting the listed cash balances so that they would correspond to bank statements, and (2) by eliminating a $70 million "goodwill" entry that suddenly appeared (without any support or justification) on BICOM's financial statements in May 2015. The problem, however, is that those adjustments alone still did not show that the Debtors had "negative" net equities or were insolvent throughout the relevant periods, as the Trustee alleged. Even after the Trustee's proposed changes the BICOM calculations showed a positive equity value from October 2015 through March 2017, which is the period during which almost all of the challenged transfers by BICOM were made. The same exhibit showed that BRAC had a positive value (even after adjustments) throughout the period from January 2015 through March 2017. ISCOM's calculated values were positive from February 2016 through April 2016, then negative from May 2016 through August 2016, then positive for September 2016, and then negative from October 2016 through the bankruptcy filing in March 2017.

The Trustee also suggested that BICOM listed marketable securities in its monthly financial statements and that the Trustee found no evidence that BICOM ever owned marketable securities. The Trustee did not offer an exhibit at trial showing what effects the removal of

"marketable securities" would have, but Schedule B to the Trustee's post-trial submission of proposed findings of fact and conclusions of law sets forth such calculations based on other evidence at trial. However, even if the entries for "marketable securities" were removed and if the Trustee's other proposed adjustments were made, BICOM's reported equity still would have been positive from October 2015 through March 2017, except for two negative calculations in October 2016 and December 2016.

More importantly, all of the Trustee's calculations represent adjustments to "book" figures. During most of the relevant period the dealerships were operating businesses. The real value of an operating business lies in the profits it may generate from operations, and not just in the static and likely historical "book" values of the assets that it holds. The Trustee asserted very generally that the Debtors were not profitable, but the financial statements say otherwise (at least for some time periods), and no contrary proof was offered.

The Trustee testified that a glaring error in the monthly financial statements occurred in August 2016, when the dealers allegedly understated their liabilities to Chase under a floor plan financing arrangement. However, the liability was a joint liability shared by the three Debtors and also by some non-debtor companies. No evidence was offered as to how the Debtors had determined their individual obligations under the floor plan arrangement or as to whether that was a reasonable estimate of each Debtor's liability while the three Debtors were still in operation. Furthermore, the Trustee's evidence was limited to the month of August 2016. The Trustee speculated that prior statements probably also understated the floor plan liabilities, but no proof was offered. It should have been a simple matter to obtain (from Chase) statements of the actual loan balances from time to time and to compare those to the monthly financial statements, but the Trustee did not do so.

The Trustee also offered evidence showing that the actual dollar amounts of the proofs of claim that were filed vastly exceeded the amounts of the liabilities shown on the Debtor's monthly financial reports. The Trustee only offered evidence as to "claimed" amounts, not as to "allowed" or verified debts. More importantly, the Trustee offered no evidence as to the sources of the disparities or as to the times when any debts arose that were not reflected in the monthly financial reports, or to show that the liability figures in the monthly reports actually were understated at the times when the relevant transfers were made.

Finally, the Trustee offered into evidence BRAC's tax return for the calendar year 2015, which showed a net loss. However, the Trustee himself cast doubt on the accuracy of BRAC's financial records and particularly of its reporting of vehicle sales. No explanation was offered as to the various income and expense items that were listed, or as to the accuracy of the calculations, or as to whether there was any difference between BRAC's loss for tax purposes and its actual operating results.

The Trustee opined, based on all of the foregoing, that it should be clear that the Debtors were insolvent and that further details should not be needed. But the Trustee did not testify as an expert witness, and in any event the Trustee's or even my own instincts and suspicions as to what might have been the case are not a proper substitute for actual evidence.

On the other hand, Boyko offered no evidence that the Debtors were solvent at any time. Boyko disclaimed any knowledge of the Debtors' financial condition, and instead confirmed his own understanding that the dealerships never made money and always were behind in paying bills or unable to pay bills. Flom similarly offered no evidence, having failed even to appear for the trial. The monthly financial statements were in evidence, but the Trustee disavowed their accuracy, and no contrary evidence was offered that would permit the Court to put faith in them.

Nilva acknowledged that at some point BICOM and the other Debtors could not pay their debts, though his testimony was vague as to when that occurred.

Deciding whether the Debtors were "insolvent," then, boils down to which party had the burden of proof.  If the Trustee had the burden to prove "insolvency" then the evidence was insufficient.  To the extent that the transfers to Boyko and Flom were made without consideration, however, Boyko and Flom had the burden to prove that the Debtors were solvent at the times of the transfers.  They failed to do so, as no evidence was offered as to the reliability of any of the debtors' financial reports or as to the Debtors' actual assets, liabilities and earnings.

I therefore find that the Debtors were insolvent at the times when they made transfers to Boyko without consideration, and those transfers are subject to avoidance and recovery under sections 544 and 550.  This includes all of the transfers to Boyko with the exception of the final $100,000 of transfers that BICOM made.  I find that the final $100,000 of transfers that BICOM made constituted repayments of debts and therefore were made in exchange for consideration.  I therefore cannot indulge a "presumption," as to Boyko, that BICOM was insolvent at the times of those particular transfers.  If the Trustee had proved that BICOM was insolvent then the Trustee could have invoked the separate presumption that a debt repayment to Boyko was not in "good faith."  However, the Trustee did not prove insolvency at the times of those transfers, and therefore the Trustee is not entitled to invoke the New York rule against payments by an insolvent entity to its insiders.  I therefore find that the Trustee has failed to sustain his burdens as to that last $100,000 of transfers that BICOM made to Boyko.

All of the transfers to Flom were without consideration, and Flom failed to show that the Debtors were solvent at the times of those transfers.  I therefore find that the Debtors were

insolvent at the times of the transfers they made to Flom and that all of the transfers are subject to avoidance and recovery under sections 544 and 550.

**B.     Whether the Debtors Had Unreasonably Small Capital at the Relevant Times**

In order to recover transfers pursuant to DCL § 274 the Trustee must show that, at the time of the transfers, the relevant Debtor was engaged in or about to engage in a business or a transaction that would leave it with unreasonably small capital. *Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC.),* 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013). This test denotes a financial condition short of actual insolvency and "is aimed at transferees that leave the transferor technically solvent but doomed to fail." *Id.* (citing *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*), 910 F. Supp. 913, 944 (S.D.N.Y. 1995). A debtor has "unreasonably small" assets if insolvency is inevitable in the reasonably foreseeable future. *Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Communs. Corp.),* 652 F. App'x 19, 21(2d Cir. 2016). Factors that may be relevant in determining whether capital was unreasonably small include the transferor's debt to equity ratio, its historical capital cushion, and the need for working capital in the transferor's industry. *Vivaro Corp.*, 524 B.R. at 551; *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993).

The most important consideration in determining whether a business had unreasonably small capital is whether the business has or can generate resources from its operations or from asset sales to sustain its operations. *Moody*, 971 F.2d at 1070 ("unreasonably small capital" is a situation marked by the "inability to general sufficient profits to sustain operations"); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 137 (Courts look "to the ability of the debtor to generate enough cash from operations or asset sales to pay its debts and still sustain itself."). The fact that a business actually survived for a considerable period of time after a challenged

34

transfer is a factor that a court may consider in deciding whether the business had unreasonably

low capital at the time of the transfer.  *See Moody,* 971 F.2d at1074; *Daley v. J.F. Chang (In re*

*Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002).  However, it is only one of

many factors that may be relevant, and is not necessarily controlling.  *Tronox, Inc. v. Kerr*

*McGee Corp. (In re Tronox, Inc.)*, 503 B.R. 239, 322 (Bankr. S.D.N.Y. 2013).

No presumptions are applicable with respect to the Trustee's claims that the Debtors had

"unreasonably small capital."  It is the Trustee's burden to prove such contentions.  *See In re*

*Vivaro Corp.*, 524 B.R. at 551 ("By contrast, no such presumption exists for NYDCL section 274

claims.").

The Trustee's evidence about the actual operating condition of the Debtors failed to meet

the Trustee's burden to prove that the Debtors had unreasonably small capital.  The Trustee

contended that the Debtors were not profitable, but the portions of the deposition testimony of

Nilva and Flom that were cited by the Trustee do not support those assertions.  No actual proof of

the results of the Debtors' ongoing operations ever was offered.

The Trustee argued that the Debtors had relatively small balances in their bank accounts,

but "capital" can consist of paid franchises or other assets, and small cash bank balances are not

enough to prove unreasonably small capital.  It was also plain from the testimony that Flom and

Nilva were unclear as to what constituted "capital" for purposes of the Trustee's questions.  For

example, the Trustee argued that BICOM had little capital, but also offered into evidence an

operating agreement that showed a $12 million capital contribution by BNF.  In fact, it appears

that most of Boyko's investments likely were funneled through BNF, which then made capital

contributions to the Debtors in order to comply with manufacturers' requirements.

The Trustee also argued that the Debtors did not comply with manufacturers' requirements regarding the maintenance of debt-to-equity ratios of 1:1 or better. However, a failure to comply with contractual terms is not the same as proof that the Debtors had "unreasonably small capital" for purposes of the Debtor and Creditor Law. Many businesses operate with higher debt-to-equity ratios than 1:1, and they are not generally considered to have unreasonably small capital just because of those ratios.

I conclude that the Trustee failed to carry his burden to prove that the Debtors had unreasonably small capital at the times of the challenged transfers.

### C.    Whether the Debtors Made Transfers Knowing They Could Not Repay Debts

Section 275 of the New York Debtor and Creditor Law provides that a transfer is fraudulent if it is made without fair consideration at a time when the transferor intended to incur, or believed that it was incurring, debts that would be beyond its ability to pay as they matured. In order to prove a claim under section 275 of the DCL, the Trustee must show that at the time of each challenged transfer the relevant Debtor had a subjective belief that it was incurring or would incur debts beyond its ability to pay as they matured. *See In re Best Prods. Co.*, 168 B.R. 35, 52-53 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir.1995); *see also Grace Plaza of Great Neck, Inc. v. Heitzler*, 2 A.D.3d 780, 781, 770 N.Y.S.2d 421, 423 (2d Dep't 2003) (Pursuant to NY DCL § 275, a conveyance made by a person who has a "good indication of oncoming insolvency" is deemed to be fraudulent); *Kramer v. Chin (In re Louise Chin)*, 492 B.R. 117, 129 (E.D.N.Y. Bankr. 2013) (section 275 requires proof of awareness by the transferor that, as result of the conveyance, he will not be able to pay present and future debts). So far as we are aware, the New York courts have not adopted any presumptions with regard to such claims, and the burden of proof rests with the Trustee.

The Trustee failed to prove that the Debtors made transfers at a time when they actually believed or intended that they were incurring debts that they would be unable to pay. In fact, little or no evidence at all was offered as to the subjective beliefs of Nilva, Flom and Boyko in this regard.

The Trustee argues that BICOM negotiated a lease and that Nilva allegedly knew that BICOM would not be able to satisfy that obligations under that lease going forward, but in the cited deposition testimony Nilva merely confirmed that he had asked questions about this, and that Flom had showed him spreadsheets showing that BICOM would generate a profit. Nilva also testified that there were times when the Debtors had "difficulty" paying debts, but that vague testimony falls well short of proof that the Debtors incurred liabilities with the actual intent or belief that they would be unable to pay them in the future. Vague doubts or uncertainties fall well short of proving an actual belief or intent that the Debtors were incurring debts that they would be unable to pay.

I conclude that the Trustee failed to carry his burden to prove that the Debtors made transfers at times when they intended or believed that they were incurring debts that they would be unable to pay as they came due.

### 7.    Prejudgment Interest

The Trustee exercised the rights granted to him by section 544 of the Bankruptcy Code to pursue claims that creditors could have pursued under New York law. Since the Trustee's claims invoked the New York statutes, the Trustee has sought prejudgment interest at the rate of 9%, citing section 5004 of the New York Civil Practice Law and Rules. *See* N.Y.C.P.L.R. § 5004. The Court of Appeals for the Second Circuit has held, however, that when a trustee pursues claims under the authority granted by section 544 of the Bankruptcy Code the trustee does not

have an automatic right to prejudgment interest under state law, and that instead the award of

prejudgment interest is subject to the discretion of the trial court.  *See Kittay v. Korff (In re*

*Palermo)*, 739 F.3d 99, 106-108 (2d Cir. 2014).  Under prevailing Second Circuit authorities, I

have discretion as to whether to award prejudgment interest at all and, if I do, to choose the

appropriate rate and the date(s) from which interest should accrue.  *Id*.

In order to determine whether prejudgment interest should be awarded the Court must

consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii)

considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the

statute involved, and/or (iv) such other general principles as are deemed relevant by the court."

*Wickham Contracting Co. v. Local Union No. 3, Int'l Brotherhood of Elec. Workers, AFL-CIO*,

955 F.2d 831, 834 (2d Cir. 1992).  The purpose of an award of prejudgment interest is to make

the plaintiff whole rather than to punish defendants or to provide plaintiff with a windfall.  *Jones*

*v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (citations and quotations

omitted).  Although an award of prejudgment interest is discretionary, it should ordinarily be

granted absent a sound reason to deny it.  *McHale v. Boulder Capital LLC (In re 1031 Tax Grp.,*

*LLC)*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010).

An award of prejudgment interest is appropriate here because there is a time value to

money and the Trustee (and the creditors of these estates) are entitled to compensation for delays

in recovering funds from Boyko and Flom.  However, I do not agree with the suggestion that

interest should accrue from the date(s) of the original transfers.  While creditors might have had

authority to challenge the transfers on those dates, the Trustee (or the debtors in possession as his

predecessors) acquired the right to do so only upon the commencement of these bankruptcy

cases, which occurred on July 10, 2017.  Since the claim under section 544 accrued upon the

commencement of the cases, I believe that the commencement date is the appropriate date from which to measure the accrual of prejudgment interest. This is consistent with other authorities. *See McHale,* 439 B.R. at 89; *see also Murray v. Louisiana State Univ. Found. (In re Zohdi)*, 234 B.R. 371, 385 (Bankr. M.D. La. 1999) (noting that the purpose of prejudgment interest in a case under section 544 is to compensate the estate itself for the time it was without the use of the transferred funds).

As Judge Glenn observed in the *McHale* case, courts have adopted many different methodologies for determining an appropriate prejudgment interest rate. Some courts prefer to use the treasury-bill rate that is used in computing post-judgment interest on federal judgments; others have used the New York statutory rate, and still others have used prime or other market interest rates. *Id.* at 88-89. I do not believe that use of the 9% New York statutory rate would be appropriate in this case. The 9% rate was put in place at a time when market interest rates were much higher than they are now. Awarding interest at a 9% rate would over-compensate the Trustee for delays in obtaining funds, and would punish the defendants and grant a windfall to the Trustee. On the other hand, the current federal post-judgment interest rate (which is only .08%) is lower than the post-judgment rates that were in effect between 2017 and today, and would not adequately compensate the estates for the actual time value of money during the periods when these cases were pending. For example, the federal post-judgment interest rate on the date of the commencement of these cases was 1.22%. While other interest rates may have been higher, bankruptcy rules limit the investments that debtors may make, and the federal judgment rate approximates what the estates could have earned if cash had been available to them. I believe that the federal post-judgment rate on the date of the commencement of these

bankruptcy cases is an appropriate way to measure the damages the estates suffered from not having the transferred funds available.

Accordingly, I will award prejudgment interest at the simple (not compounded) rate of 1.22% from and after July 10, 2017, which was the date on which the Debtors filed their bankruptcy petitions.

### Conclusion

Based on the foregoing, the Court finds that the Trustee is entitled to the entry of judgment against Boyko in the following amounts on behalf of the following Debtors:

| Entity | Principal | Prejudgment Interest | Total |
|--------|-----------|----------------------|-------|
| BICOM | $700,000 | $34,791.73 | $734,791.73 |
| ISCOM | $200,000 | $9,940.49 | $209,940.49 |
| BRAC | $306,250.00 | $15,221.38 | $321,471.38 |

The Court also finds that the Trustee is entitled to the entry of judgment against Flom in the following amounts on behalf of the following Debtors:

| Entity | Principal | Prejudgment Interest | Total |
|--------|-----------|----------------------|-------|
| BICOM | $1,768,550.00 | $87,901.30 | $1,856,451.30 |
| ISCOM | $141,000.00 | $7,008.05 | $148,008.05 |
| BRAC | $258,263.87 | $12,836.35 | $271,100.22 |

The Court will enter orders directing the Clerk of the Court to enter judgments that reflect the foregoing rulings.

Dated:  New York, New York
        August 5, 2021

/s/ **Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge